## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MARY MCDONALD, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case No. 14-1020-KHV** |
| ) | |
| CITY OF WICHITA, KANSAS, and ) | |
| GARY REBENSTORF, ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

## <u>MEMORANDUM AND ORDER</u>

Mary McDonald brings employment claims against the City of Wichita, Kansas and Gary Rebenstorf. Specifically, plaintiff alleges that Rebenstorf deprived her of First Amendment right to free speech and free association and denied her equal protection under the Fourteenth Amendment in violation of 42 U.S.C.§ 1983. Plaintiff claims that the City discriminated against her on the basis of sex and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e <u>et seq.</u>, and the Kansas Act Against Discrimination ("KAAD"), K.S.A. § 44-1001 <u>et seq</u>. This matter is before the Court on <u>Defendants' Motion For Summary Judgment</u> (Doc. # 59) filed May 22, 2015. For reasons stated below, the Court finds that the motion should be sustained in part.

## <u>Legal Standards</u>

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Hill v. Allstate Ins. Co.</u>, 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the suit under the

governing law." Liberty Lobby, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.  Id. at 252.

The moving party bears the initial burden of showing that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Justice v. Crown Cork & Seal Co., 527 F.3d 1080, 1085 (10th Cir. 2008).  Once the moving party meets the initial burden, the burden shifts to the nonmoving party to show that a genuine issue remains for trial with respect to the dispositive matters for which the nonmoving party carries the burden of proof.  Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 739 (10th Cir. 2004); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  As to these matters, the nonmoving party may not rest on the pleadings but must set forth specific facts. Fed. R. Civ. P. 56(e)(2); Matsushita, 475 U.S. at 586-87; Justice, 527 F.3d at 1085. Conclusory allegations not supported by evidence are insufficient to establish a genuine issue of material fact.  Jarvis v. Potter, 500 F.3d 1113, 1120 (10th Cir. 2007); see Kidd v. Taos Ski Valley, Inc., 88 F.3d 848, 853 (10th Cir. 1996).

When applying this standard, the Court must view the factual record in the light most favorable to the party opposing the motion for summary judgment. Duvall v. Ga.-Pac. Consumer Prods., L.P., 607 F.3d 1255, 1260 (10th Cir. 2010); see Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  Liberty Lobby, 477 U.S. at 250-51.  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

2

**Facts**

The following facts are uncontroverted or, where controverted, construed in a light most favorable to plaintiff.

The City of Wichita, Kansas, is a municipality in Sedgwick County, Kansas.  The City has an internal Law Department with a Civil Division and a Criminal Division.  The Civil Division staff provides legal advice to the City, drafts and reviews contracts, renders legal opinions and conducts civil litigation.  The Criminal Division, known as the Prosecutors' Office, prosecutes criminal, traffic, domestic violence and environmental cases in municipal court, administers diversion and deferred judgment programs and assists citizens on a walk-in basis.  Together, the two divisions employ approximately 26 individuals, including 13 attorneys.  The City Attorney/Director of Law heads both divisions.

In 1976, the City hired Gary Rebenstorf as an attorney in the Law Department.  From 1991 until he retired in 2014, he served as City Attorney/Director of Law.

In March of 2000, the City hired Mary McDonald to serve as Chief Prosecutor and supervisor of the Prosecutors' Office.[1]  On March 2, 2012, the City eliminated the Chief Prosecutor position, and McDonald  accepted a position as Assistant City Attorney I.  On July 18, 2012, McDonald resigned from that position. During her tenure as Chief Prosecutor, McDonald performed her job well and received positive performance reviews.

---

[1]     From October of 1988 to May of 1990, McDonald had worked as a prosecutor in that office.

City Policies

The City has a policy to "extend equal opportunity to qualified applicants and employees without regard to race, religion, color, sex, marital status, national origin, ancestry, disability, political affiliation, age, sexual orientation or other non-merit factors." Stipulated Statement Of Facts (Doc. #56) filed May 12, 2015, at 2. City policy expressly prohibits discriminatory harassment, intimidation and insult, and requires every employee to report sexual harassment. It also requires all supervisory employees to investigate and take immediate corrective action on complaints of sexual harassment. The policy expressly prohibits retaliation against a person who files a complaint or participates in an investigation of a complaint.[2] All employees are required to cooperate in any investigation under this policy.

The City Council determines the budget for wages and salaries and fixes the compensation of all employees. Under city policy, the City Manager appoints and removes all city officers and employees and his or her decisions on employee matters are final. See Stipulated Facts at 3-4. City policy also provides that if the City must eliminate positions for budgetary or other reasons, the department director will identify the positions to be reduced, and the Human Resources Department will develop a ranked list of employees in the affected job classification. Based on this list, the department head will produce a "Lay-off Plan" for approval by the Human Resources Director and City Manager. Id. at 3.

---

[2]     The policy incorporates an Equal Employment Opportunity Notice which defines illegal discrimination and retaliation. The notice is communicated to all employees and posted in all work places.

Chronology Of Events

In October of 2009, Assistant City Attorney Jan Jarman filed an internal complaint of discrimination alleging that Rebenstorf had discriminated on the basis of gender when he denied her application for a promotion. In January of 2010, the Human Resources Department informed Jarman that it had found no evidence to support her allegations.

On February 6, 2010, City Manager Robert Layton emailed Rebenstorf his annual goals for Rebenstorf as head of the Law Department, as follows:

> 1. Review the office workflow to determine a method for expediting the legal review and opinion/advice process. This review should be completed by 7/1/10.
> 2. Review the work performed to date and research best practices from other cities to enhance the effectiveness of the diversion programs. This work should be completed by 12/1/10.
> 3. Develop a system for multiple staff reviews of legal advice provided to the Mayor and Council in an effort to improve accuracy. This system should be implemented by 3/1/10.
> 4. Review the organization of the office to determine if staff assignments are properly aligned with the legal needs of the City organization. Conduct a best practices review of other municipal law departments to obtain ideas for a possible restructuring. This work should be completed by 6/1/10.
> 5. Develop a continuing legal education program for City staff, perhaps through the use of seminars and lunch and learn sessions. This program should be coordinated with HR and should be implemented by 9/1/10.

Stipulated Facts, ¶ 22, citing Ex. 6 at KHRC 0371. On February 22, 2010, Rebenstorf agreed to accomplish these goals and stated that "this will be a good opportunity to review staff assignments, processes and procedures." Stipulated Facts, ¶ 23, citing Ex. 36 at DEF001230.

On May 19, 2010, Layton sent a memorandum to all city departments heads regarding the budget process for 2011-2012, stating as follows:

> Based on financial trends, the status quo is not affordable in the future;

> The organization must be re-shaped, and at an accelerated pace.

The City's budget is *$3 million out of balance in 2010; $7 million in 2011*;

Management staff are tasked with creating strategies to transform and right size the organization;

The department heads are to challenge the current management structure; develop the right, presumably leaner structure going forward;

Each [d]epartment head team should convene and develop a prioritized list of right-sizing recommendations for their departments. Staff should consider cost recovery for revenue generating programs; and

Each department should provide a complete report that includes the identification of lower priority services that could be discontinued; suggestions to restructure the organization to enhance efficiency; and recommendations to streamline management and/or administrative functions.

Time will be scheduled on June 1st and 2nd (of 2010) for [d]epartment managers to present their findings as part of the budget development process.

Stipulated Facts, ¶ 24.

On August 13, 2010, Rebenstorf sent an email to city prosecutors regarding Layton's directives,

as follows:

the City Manager has challenged each department in the City to transform the way services are provides to citizens and the organization. The budget deficits experienced this year and anticipated in 2011 and 2012 require a change from doing business as usual. The budget cuts for the Law Department were the most difficult we have had to address in years. In order to professionally and ethically perform legal services for the City, it is necessary to maintain the attorney staffing level.

Stipulated Facts, ¶ 25(a). Rebenstorf informed the prosecutors that this was an opportunity to review

prosecution legal services, as follows:

In order to conduct this review, I need to determine just exactly what each one of you do in providing prosecution legal services. I need to know your daily, weekly, monthly, and yearly activities. With this information, I will be able to determine the best way to develop a work plan and have the office function efficiently and effectively.

Id. Rebenstorf asked each prosecutor to complete a survey to help find "solutions to the challenge we

are facing." Id. Rebenstorf conducted the survey because of the City Manager's directive and, because he was not involved in day-to-day management of the Criminal Division, to obtain detailed knowledge of its operations. Ex. 83 at 1-2, ¶ 4.[3]

Defendants cite the survey results as revealing "leadership problems with resolving conflicts, cross-training, docket assignments and overall management of the Prosecutor[s'] Office." Doc. #69-8 at 12. None of the respondents suggested that the City eliminate the Chief Prosecutor position, however, and after reviewing the surveys, Rebenstorf did not conclude that the City should eliminate that position. Ex. C, Rebenstorf Depo. at 64. One respondent stated that "[p]rofessionally, the best thing that has happened to this office was when the Chief Prosecutor's position was created. This made [p]rosecutors more accountable and gave them a support system when questions emerged on difficult cases." Ex. E at DEF001312.

On September 3, 2010, Rebenstorf met individually with each prosecutor, including McDonald, to review their survey responses. On September 9, 2010, Rebenstorf told the prosecutors that he had identified one clear issue from the survey responses and individual meetings: "the City Attorney's Office needs more and better communications between the 2d [floor] (Prosecutors' Office) and 13th floor (Civil Division) floor." On September 13, 2010, Rebenstorf implemented a plan to temporarily assign one prosecutor to the 13th floor in the Civil Division on a four week rotation.

On September 16, 2010, Rebenstorf told prosecutors that on October 1, 2010, Sharon Dickgrafe,

---

[3]        Rebenstorf sent an email to Layton, informing him that he was conducting a survey of city prosecutors due to "recent budget adjustments and [his] direction to transform the way services are provided to the citizens and the organization." Rebenstorf indicated that he intended to use the surveys "to fashion a work plan to transform the prosecution services of the office." Layton thanked Rebenstorf for his work and offered assistance from the city budget and project management offices. Stipulated Facts, ¶ 25(b), citing Ex. 40 at DEF001235.

First Assistant City Attorney in the Civil Division, would present a plan to address common issues identified from the surveys, including lack of cross training, inequitable dockets and the deferred judgment program.[4]  Stipulated Facts, ¶ 28.[5]

On September 24, 2010, based on discussions with city prosecutors, the municipal judge, court staff and the probation department, Dickgrafe gave Rebenstorf several options for docket assignments. Dickgrafe confirmed the need to cross train prosecutors and rotate dockets.[6]  She stated that some

---

[4]     Rebenstorf later testified that he selected Dickgrafe to develop the plan because based on survey results and interviews, he had lost confidence in McDonald's management. He believed that Dickgrafe could provide an objective perspective and that she had insight based on her previous experience as a city prosecutor.

[5]     On September 17, 2010, in reaction to Rebenstorf's email that Dickgrafe was working on a plan regarding the dockets, Jarman sent the following email to all prosecutors:

> From Gary's email I surmise that some of my co-workers are unhappy with their docket assignments. He mentioned that some of you complained that the dockets are not equitable. I would like to offer my services for those of you who are having trouble with your workload. Last week I prepped two criminal dockets. I also took some of my own work home. I also prepped two criminal dockets the week Maria was gone. If [any one] of you wants the DUI docket, you are more than welcome to it. We can switch today as far as I am concerned. Over my THIRTEEN years here, I have basically worked 6 years on DV and 6 years on criminal, with a few exceptions here and there. For many of those years I did those dockets completely alone. I took all of my prepping home. All of it. The current assignments are not heavier than anything I did in the past. If you are having trouble with your workload, feel free to ask for an immediate docket change. I am willing to take any docket you are having trouble with. This is a sincere offer. I am ready, willing, and able to do any docket you need me to do. I would suggest you contact Gary or Sharon to clear the docket change, but I am fine with beginning fresh on Monday morning. In fact, if anyone wants to do the DUI check lane this weekend, please feel free. I am supposed to be there from 9pm-1am Saturday night. My husband is out of town, so I will have to leave my kids at home alone to get that done. So, if any of you would rather take that, feel free.

Stipulated Facts, ¶ 29, citing Ex. 43 at DEF000841.

[6]     Dickgrafe noted that the docket assignments were made on the basis of what
(continued...)

prosecutors resented the fact that they were not allowed to gain trial experience on the drug diversion, driving-under-the-influence and domestic violence dockets, and that lack of cross-training placed strains on the office when a prosecutor handling one of those dockets was absent.  Dickgrafe recommended rotating all dockets on four or six month intervals and proposed that McDonald assign dockets with approval of the City Attorney.  Dickgrafe also observed as follows:

> There is a consensus among the prosecutors that the supervisor [McDonald] needs to take a more active role in assisting with dockets, case review or walk[-]ins when the office is short staffed. While it is agreed that the supervisor has done a good job making sure dockets are covered, by re-assigning prosecutors, there is a feeling that she is unwilling to actually handle a docket or try cases.  With staff continuing to diminish, someone will have to be willing to step in and help with the dockets.  I think part of this issue may be perception, or lack of information regarding what other tasks the supervisor has been assigned. . . .  This appears to be a lack of communication issue.

Stipulated Facts, ¶ 31.  On October 1, 2010, Rebenstorf and Dickgrafe met with the prosecutors to discuss the proposed changes.

On October 20, 2010, Dickgrafe sent Rebenstorf a memo entitled "Prosecutor[s'] Office Reorganization."  Ex G, Rebenstorf Depo.  The memo did not mention the Chief Prosecutor position or McDonald and did not suggest that the City eliminate any attorney position.

On November 5, 2010, Rebenstorf sent the prosecutors a memo regarding the "Plan For Prosecutor[s'] Office" which outlined changes, including new docket assignments for all prosecutors including McDonald, effective November 29, 2010.  Rebenstorf reassigned Jarman to the mental health and drug court docket.  The memo did not mention elimination of the Chief Prosecutor position.  Rebenstorf later testified that "[a]t the time the surveys were done, there was no – nothing on the radar screen to eliminate the chief prosecutor position."  Ex. C, Rebenstorf Depo. at 69.

---

[6](...continued)
individual prosecutors "like" to do.

On November 10, 2010, Jarman submitted an internal complaint to the Human Resources Department.  Ex. 45 at DEF000534-541.  In part, Jarman alleged that Rebenstorf had assigned her the mental health and drug court dockets to retaliate for her discrimination complaint in 2009.  Id. at DEF000534.  Jarman filed an almost identical complaint with the Equal Employment Opportunity Commission.  In the summary portion of her complaints, Jarman claimed that the City subjected her to the following adverse employment actions:

> She was removed from a trial docket.  She attributed this to Rebenstorf, stating that "This was the first time in 13 years Rebenstorf took any interest in specific docket assignments, and "Although [Dickgrafe] recommended I remain on a trial docket, Gary forced me to the non-trial docket."

> Her job duties were no different than that of an entry level attorney;

> She was not allowed to use business hours for training meetings even though other prosecutors were allowed to do so; and

> The supervisory structure of the Prosecutors' Office has changed due to blame placed on my immediate supervisor, Mary McDonald. . . .  I feel she has been stripped of her duties because she somehow didn't keep me from complaining.

Id. at DEF000539-540.  Jarman listed McDonald as a witness in her complaints.

On November 29, 2010, the City and Rebenstorf received notice of Jarman's complaint. McDonald did not know about Jarman's complaint until November 29, when Jarman came by her office to tell her about it.[7]  McDonald was going to go talk to Rebenstorf after Jarman left her office.  He

---

[7]    In response to a question about when she first heard about Jarman's complaint, McDonald testified as follows:

> It was actually right before I met with Gary [Rebenstorf] up in his office.  And she [Jan Jarman] ducked by my office and ducked her head in the office and she said, can I talk to you for a minute.  And I said sure.  So she came in and she sat down and she said, I need to tell you about something that I did.  And I said okay.  And she said that she had filed an EEOC complaint against Gary.  And I thought oh my gosh, you

(continued...)

called McDonald, however, and said that he needed her in his office right away.  Ex. 82, McDonald

Depo. at 30-31.  When McDonald arrived, he was angry.  She later testified as follows:

> And I said, if this is about Jan's complaint, I didn't know.  And he said, I trusted you.  I
> trusted you.  I trusted you to tell me everything to run that department.  I trusted you.
> And I said, I didn't have anything to do with that.  I didn't know. * * * He didn't say
> anything about managing the department.  He just said that he trusted me.  He trusted me
> to tell him stuff and I didn't tell him and, you know, [he] didn't believe me that I didn't
> have anything to do with her.

Ex. A, McDonald Depo. at 32, 77.  Rebenstorf denies that discussion, stating that he purposefully never

discussed the matter with McDonald because it did not involve her.  Ex. 83 at 4, ¶14.  Until an interview

on March 24, 2011, McDonald had no further involvement with Jarman's complaint.

After Rebenstorf learned of Jarman's EEOC complaint, he began stripping McDonald's job

duties.  See Ex. C, McDonald Depo. at 35-37.  He also withdrew his consent for McDonald to go to a

national seminar in 2011, stating that it was not relevant.  Id. at 37.

On November 29, 2010, the changes to the Prosecutors' Office (as outlined in Rebenstorf's

memorandum of November 5, 2010) became effective.  Stipulated Facts, ¶ 36(a), citing Ex. 44 at

DEF001555-57.

On December 15, 2010, Rebenstorf sent an email to Dickgrafe stating that he was looking at a

---

[7](...continued)
> know.  And she said – she didn't tell me when she filed it.  She just said that she had
> filed it and I said, how come you didn't say anything to me.  And she said, I was
> afraid that you would try and talk me out of it, and that's why I purposefully didn't
> say anything to you.  And then, after my conversation with her, because my next step
> would have been [to go] upstairs to tell Gary 'cause I told Gary everything.  And
> before I got that opportunity, I get a phone call from him saying, I need you to come
> [to] my office right now.  So it kind of happened simultaneously almost, I mean, one
> after the other.

Ex. 82, McDonald Depo. at 30-31.  Jarman also testified that McDonald had no idea that she was
going to file a complaint, and that McDonald was not part of her decision to file it.

new way of doing business for the supervisor of the Prosecutors' Office. He stated that the Chief Prosecutor should handle dockets on a regular basis, not just as a back-up. He suggested that the Chief Prosecutor handle all dockets for a two-week period during the course of a calendar year. He proposed that McDonald's first docket assignment be January 17, 2011. Stipulated Facts, ¶ 39, citing Ex. 47 at DEF001585. On December 17, 2010, Dickgrafe responded that a two-week rotation was too short. Stipulated Facts, ¶ 40, citing Ex. 48 at DEF001587. She proposed a six-month rotation but also expressed concern that scheduling conflicts would result in a "continuing shift of responsibilities among other prosecutors." Id. She stated that "[w]e have placed a lot of change on them already. It must be a priority for the supervisor to actively try cases in court." Id. She included several options "for the Chief Prosecutor to actively try cases in Municipal Court." Id.

On December 28, 2010, Dickgrafe told Rebenstorf that McDonald had said that she was having difficulty keeping up with her case review and charging responsibilities. Dickgrafe expressed concern that if McDonald had the option of having other prosecutors back her up on case review and charging, she would transfer this responsibility to Jarman or another prosecutor. Dickgrafe stated that McDonald was not responsive to general office issues including record retention and scanning. Stipulated Facts, ¶ 41.

On February 23, 2011, Rebenstorf emailed McDonald concerning Chief Prosecutor docket assignments. He stated that in addition to her duties as a supervisor, she would handle traffic arraignments, walk-in dockets and traffic calls.

On March 7, 2011, Dickgrafe emailed Rebenstorf, stating that several prosecutors had met with her to discuss concerns which they felt they could not express during a meeting with McDonald because "there is a general fear of retribution by [McDonald] if negative comments are made by her staff."

Ex. 50 at DEF0001431.  Dickgrafe stated that the comments centered around three issues: McDonald's

unwillingness to handle case review; her comments that prosecutors should "work ahead" and cover

diversions when on vacation; and her comments that Kellogg Street tickets should never be amended.

Id.  Dickgrafe stated that according to one prosecutor, McDonald delegated follow-up for case reviews

to other prosecutors.  She also stated that according to several prosecutors, McDonald complained about

how long it took her to complete domestic violence case review, but that when she was gone, Jarman

took less than two hours to complete the same review.   Id.  Dickgrafe continued as follows:

> Lastly, a concern expressed to me repeatedly throughout this process is that the level of
> "drama" continues to be high in the office.  Complaints made to me have included the
> following: [McDonald] is generally unavailable.  She sits in her office for hours with her
> door shut. There is a consensus that no one knows exactly what she does with her time.
> If there are issues that need attention [McDonald] will appoint or delegate the issue to
> another prosecutor rather than attempt to deal with it herself.

Ex. 50 at DEF0001432.  Dickgrafe concluded as follows:

> Short of having [McDonald] be required to cover a docket and be held accountable if she
> does not appear at the docket, I am at a loss how else to get her engaged in prosecution
> activities at the Municipal Court level.

Id.

On March 24, 2011, Michelle Moe, an attorney whom the City hired to investigate Jarman's

EEOC complaint, interviewed McDonald about Jarman's complaint.  Stipulated Facts, ¶44.  McDonald

had reservations about participating in the interview, as follows:

> I was even thinking about not participating, and I had discussed it with Kelly [Rundell,
> an attorney in the Law Department] beforehand because Gary's conduct to me had
> increasingly got worse between -- you know, like the light switch being flipped on and
> off.  And so I told Kelly that I thought that if I participated, it was going to get worse
> because I had – I was going to be truthful about, you know, answering the questions.  And
> that if they asked me things about his treatment of women in the office and whatnot that,
> you know, I didn't feel like I could lie about it.  And his treatment of me I didn't feel like
> I could lie about it and I just said – I said, do I have to do this.

Ex. A, McDonald Depo. at 73-74.  McDonald testified regarding the interview as follows:

13

> [Moe] wanted to talk about Jan's complaint specifically about what I knew about it and did I agree with it and, you know, those kind of things. And I think – I don't remember everything I told her, but I think I told her that I wasn't on the interview panel, so I don't know, you know, how people interviewed. I don't know how people ranked, obviously. I wasn't privy to any of that information. I did tell her that I thought Gary treated women attorneys and staff, actually, different than he treated the males in the office. And I don't remember – I remember I talked about things I had observed him do to [other women in the office] and now things that were happening to me.

Id. at 84-85. McDonald expected Moe to report to Layton the information which she provided in the interview. Id. at 74-75.

On March 25, 2011, Rebenstorf met with McDonald to conduct her annual performance appraisal. Stipulated Facts, ¶ 45. Historically, Rebenstorf had rated McDonald very highly and McDonald had consistently averaged the second highest merit pay percentage increase in the department. On the evaluation in March of 2011, however, Rebenstorf gave McDonald lower scores than in previous years; she scored a 3.1 out of 5.0 possible points, which still rated as "Performs Well." Ex. 14 at DEF000206-207. Her lowest scores were in Part 3, which pertained to supervisors. Ex. 14 at DEF000203-205. McDonald scored an "Unsatisfactory/Improvement Required" on two components, as follow:

> Leadership: Based on the Prosecutor survey in 2010, there was found a significant disparity in docket assignments and an alarming lack of cross training among the prosecution staff. Favoritism appeared to be at play and thus there was not a good use of time and prosecutor resources. Each prosecutor should be treated fairly.

> Priorities, Work Flow and Delegation: The Prosecutor [s]urvey revealed leadership problems with resolving conflicts, cross-training, docket assignments and overall management of the Prosecutor[s'] Office.

Id.[8] Rebenstorf told McDonald that according to the surveys, she showed favoritism toward Jarman and another prosecutor. During the performance appraisal, Rebenstorf did not mention McDonald's interview regarding Jarman's EEOC complaint. After the meeting on March 25, 2011 Rebenstorf often

---

[8]     Based on this performance review, McDonald qualified for a raise.

14

refused to acknowledge McDonald.

On April 1, 2011, Rebenstorf conducted a budget meeting with members of the Law Department to discuss reorganization of the office and an expected city budget shortfall of $8,500,000.00 for 2012. Stipulated Facts, ¶ 46.

On April 7, 2011, Dickgrafe sent Rebenstorf a memo which addressed ways to increase revenues and decrease expenses in the Law Department. As for the Prosecutors' Office, Dickgrafe suggested as follows:

> As the re-organization of the [P]rosecutors' [O]ffice [h]as developed, it is my opinion that the supervision structure is not working. With the loss of the [Mental Health] grant, a working prosecutor's position would be more beneficial (and cheaper) to the office than a full time supervisor. Additional prosecution responsibilities need to be added to the supervisor's position to pick up the slack, or the position needs to be morphed into another position. One thought would be to have the First Deputy position serve as the supervisor of staff for both the 13th and 2nd floor. This would make it a purely administrative position. I don't think that this position would be able to be responsible for all the office litigation as well as all the supervision functions, but by combining the roles, there is a cost saving and a better allocation of resources. Two jobs are essentially being done by one person.

Stipulated Facts, ¶ 47, citing Ex. 52 at DEF001435-36.

On April 30, 2011, Dickgrafe sent Rebenstorf a memorandum entitled "Prosecutor[s'] Office Budget Scenario without Chief Prosecutor Position" which stated:

> As part of the budget process, I had recommended that if position cuts were necessary, that perhaps the Chief Prosecutor's position could either be cut entirely, or the job duties of the position significantly re-organized.

> If the funding of the mental health prosecutor's position is cut from the budget, this will leave a significant hole in docket coverage; this is especially true if the diversion coordinator position is not replaced.

> If the Chief Prosecutor's position was eliminated, an Atty I position could be added to assist with docket coverage for the loss of the mental health court attorney's position.

15

The net savings to our office would be approximately $51,500.

The last option, as we had discussed previously, is to have [McDonald] take a more active role in the prosecution of cases.

Stipulated Facts, ¶ 48.

A jail fee issue arose in 2011 after Sedgwick County began charging the City to incarcerate city prisoners in the county jail. In response, to reduce jail fees, Layton and Law Department officials began to discuss increasing diversion and deferred judgment programs. On May 18, 2011, McDonald told Dickgrafe that the Prosecutors' Office could extend the part-time prosecutor's position to full time to do jail fee reviews and that the position, which would lose grant funding in August of 2011, could pay for itself with the reduction in jail fees. Stipulated Facts, ¶ 49. Mark Manning, City Budget Director, emailed Dickgrafe and others about the jail fee issue, stating "I don't know if it means we hire an attorney, a clerk, an external auditor or whomever, but I think the payoff would be direct, immediate and exponential." Id. On May 23, 2011, Dickgrafe presented three options regarding these issues: (1) downgrade or eliminate the Chief Prosecutor position, which would result in a savings of $54,390.52; (2) create a staff position for diversion coordinator and jail fee analyst, to be paid with reduced jail fees; and/or (3) expand the part-time prosecutor to a full time position when the mental health grant expired, paid for with reduced jail fees. Stipulated Facts, ¶ 51.

On June 10, 2011, Manning sent Rebenstorf an email stating that the City Manager was going to add a prosecutor to audit jail fees and diversion programs, and would transfer $50,000.00 from the general fund to pay for the position. He said that "aside from Fire, your department I believe is probably the only one getting any staff at all (and not losing any staff for that matter), so you may be the envy of your peers. Hopefully the mental health prosecutor (if she's the one you make full-time) is a cracker jack, because we really need the jail fees pared down." Stipulated Facts, ¶ 52.

On June 11, 2011, Rebenstorf sent Manning details of a proposed reorganization of the Law Department. Stipulated Facts, ¶ 53. Rebenstorf proposed eliminating the Chief Prosecutor position, with most of those duties transferred to Dickgrafe. He also included a comparison of the Law Department proposed budget, which would eliminate the Chief Prosecutor position, and the City Manager budget, which did not do so.

On June 23, 2011, Rebenstorf and Manning conferred regarding Rebenstorf's idea to restructure the Prosecutors' Office. Manning offered advice to Rebenstorf, including a time line to implement the change consistent with the budgeting process.[9] That same day, Rebenstorf gave City Manager Layton

---

[9]     In an email to Rebenstorf, Manning characterized Layton's position as follows:

He seems really interested in strategically enhancing our litigation efforts – i.e. a strategic shift towards litigating more and maybe settling less. I think he really wants a comfort level that any re-structuring won't affect his priority there. Nothing against [Dickgrafe] personally, I think he just wants to make sure we don't wear her down with too much work all at the same time. . . . .

Pragmatically, if the Manager directed us, we could show it in the 2011 Revised [Budget]; however, that would be a little bit unusual. More typical would be to accelerate it into the 2012 Proposed [B]udget (for now we are assuming it in the 2013 budget). That would mean you would start the layoff process probably in September (after Council budget adoption), to be finished no later than 1 January 2012. Finally, another thing we have done at times is delete a budget in the budget year (2012 in this case), but delete the implementation of the layoff until later into the budget year. For example, if the Manager wasn't completely sure, we could still show the position change in 2012, but not implement the change until he gave us the go ahead next year. I don't really like this way – it makes the shift more subjective – but we could do it that way to give him more time to consider the options.

With all that said, I think his decision will be whether he wants to wait and make sure you can make progress with litigation enhancement and jail fee mitigation before we rock the boat; or whether we need to rock the boat to ensure that you can make progress on litigation and jail fee issues. Good luck – my absolute last chance to make a change like this and still print on time would be a week from tomorrow, or thereabouts.

(continued...)

17

a detailed explanation why he believed that eliminating the Chief Prosecutor position would not risk legal services needed by the City. Ex. O at BF0241-44. Layton tentatively approved the plan in late June of 2011. Ex. 83 at 6-9, ¶¶19-21.

At his deposition, Rebenstorf was asked what new information was available from April through June of 2011 that justified eliminating the Chief Prosecutor position. (In 2010, he had recommended expanding the Chief Prosecutor duties to include all charging decisions.) His answer: "[t]he budget." Ex. C, Rebenstorf Depo. at 140-41. Rebenstorf testified that the City Manager did not require him to cut any certain position, but that "I know that in addressing the budget, my budget is 90 percent salaries, so if I'm going to have to make any cuts it's going to be salaries." Id. at 149. Rebenstorf could not point to any document which showed that the City Manager had told him that the law department budget was being reduced or that he would be required to make cuts in staff. Id. at 155.[10] The City Manager never pressured Rebenstorf to cut attorney staffing levels. When the Kansas Human Resources Commission specifically inquired about this issue, the City responded that "[t]he City of Wichita is not aware of any communications where the City Manager insisted that the attorney staff be cut for budgetary purposes." Ex. M, KHRC 0996.

In June of 2011, an Attorney III position became vacant in the Civil Division. Ex. C., Rebenstorf Depo. at 76. The position was for a trial attorney with experience in federal civil rights litigation and specialized knowledge and experience to handle complex and difficult litigation matters.[11] Stipulated

---

[9](...continued)
Stipulated Facts, ¶ 54, citing Ex. 18 at DEF000351.

[10]     After his deposition, Rebenstorf acknowledged that the Law Department budget actually increased from 2011 to 2012.

[11]     On June 25, 2011, Layton authorized Rebenstorf to recruit candidates for the
(continued...)

Facts, ¶ 55.  At the time the City was hiring the Attorney III, Rebenstorf was advocating to eliminate McDonald's position as Chief Prosecutor.  Ex. C, Rebenstorf Depo. at 130-31.  When the City posted the Attorney III position, McDonald had no way of knowing that her position might be eliminated, so she  had no reason to apply.  If McDonald had known that the City was going to eliminate her position – or even that  Rebenstorf was advocating that the City eliminate the position – she would have done so. McDonald had experience with Section 1983 litigation. She testified as follows:

> Actually, I had handled some of the police misconduct litigation. I handled one case with Mike North and I had handled the First Amendment – a few First Amendment cases with Jay Hinkel that were civil. The jail fee case I handled with Jay Hinkel, which was a big civil case. That position involved knowledge of police procedures and what was okay and what was not okay and whether what the cops did made them liable or not liable.  And I worked very closely with the police department and I had that kind of a background that was unique.

Ex. A, McDonald Depo. at  215-16.  McDonald had extensive experience with police officers, the Police Department and the law that applied to police activity.  As Chief Prosecutor, she interacted with officers and  provided  legal  advice  to  the  police  department.   Rebenstorf  testified  that  her  duties  included

_____

[11](...continued)
Attorney III position, stating "let's find someone with a great track record."  Stipulated Facts, ¶ 55, citing DEF001471.  Rebenstorf testified that the position involved defending lawsuits filed under 42 U.S.C. § 1983 claiming the Police Department had used excessive force:

> After [Dickgrafe] was promoted to [C]hief [D]eputy we started getting or we were not started – we were getting more police excessive force cases and . . . I sat down with the manager on how we could address that. And one of the things that came up or what came out of that was to hire an outside attorney – hire an attorney to be on staff to handle Section 1983 cases and that that person had to have extensive experience and had handled those kind of cases in the past. So that was the criteria for filling the Attorney III position as it had to be someone with Section 1983 experience in federal court. And that's the way – and, again, that was because of the police excessive force litigation that we were starting to get.

Ex. C, Rebenstorf Depo. at 77.

"deal[ing] with the police department as far as charging decisions or legal advice that the police department would seek from the Prosecutors' Office."  Ex. C, Rebenstorf Depo. at 25.

In September of  2011, the City hired Chan Townsley, a male, for the Attorney III position. Townsley described his litigation experience as follows:

> At the time I was hired by the City of Wichita, I had substantial civil litigation experience in state and federal courts, primarily with tort and/or contract claims. My experience litigating federal civil rights Section 1983 claims was limited. I had prosecuted two excessive force claims that settled after notice and without filing of suit. I had served as co-counsel in another matter but had withdrawn from representation prior to that suit being filed.

Ex. P, Townsley Declaration, ¶ 3.

McDonald had significantly more experience than Townsley with police procedures and the applicable law; his primary experience was civil tort law.  McDonald's experience with Section 1983 litigation was comparable to Townsley's.  The position, however, also required substantial civil litigation experience in state or federal courts; Townsley had such experience while McDonald did not.

Rebenstorf did not notify McDonald that her position might be eliminated or consider her for the Attorney III position.  Rebenstorf testified that he was unaware that McDonald had any Section 1983 experience.  Ex. C, Rebenstorf Depo. at 78.

On July 13, 2011, Rebenstorf asked Manning to clarify whether the proposed budget would add a legal assistant in 2011 or 2012.  Manning responded that it would be in 2012.  He further stated as follows:

> Another thing you should know is we increased shrinkage in the prosecutor office budget by $50,000 in 2012. This presumes you will undertake some form of reorganization. I don't want to presume what that might look like, but I think its safe to say you might have to layoff a position later this year or in 2012 to comply with the shrinkage adjustment (depending on how you would propose to reorganize), depending on how you are staffed later this year, of course. Finally, given the criticality of the jail fee issue, you might want to consider later this fall what your organization of the [P]rosecutors' Office for 2012

> might look like, and seek to implement that later this year, rather than wait until January 1, 2012. I suspect the Manager would be highly supportive of that, again, given the importance of jail fee mitigation and the impact any reorganization might have on that effort.

Stipulated Facts, ¶ 57, citing Ex. 61 at BF0245.

On July 25, 2011, Dickgrafe sent a memo to Rebenstorf proposing "a team prosecution approach" as part of the Prosecutors' Office reorganization. The approach would have two teams to manage dockets with Attorney II positions as team leaders. Dickgrafe proposed that she meet weekly with Attorney II staff and have daily office hours in the Prosecutors' Office.

On August 3, 2011, Rebenstorf told McDonald that she would be responsible for the environmental court docket until the Prosecutors' Office hired a new prosecutor. Rebenstorf stated that "it is important to have your position actively involved in the prosecution of a daily docket. This is an important part of the transformation of the [P]rosecutors' Office." Stipulated Facts, ¶ 59.

On November 8, 2011, Dickgrafe sent Rebenstorf a memo regarding reassignment of responsibilities and elimination of the Chief Prosecutor position "due to budget cuts in 2012." Stipulated Facts, ¶ 61. On November 15, 2011, Dickgrafe told Rebenstorf that she had met with the prosecutors to evaluate diversion programs and docket rotation, and that in her opinion, "prosecution teams" could be utilized to address the loss of positions due to budget issues. Stipulated Facts, ¶ 62.

On December 6, 2011, Dickgrafe sent Rebenstorf an email regarding the Chief Prosecutor position. She stated that she had reviewed McDonald's self evaluation and believed that the planned reassignments covered all responsibilities of the Chief Prosecutor. Dickgrafe also stated that "I do think [McDonald] placed herself on a number of boards, which were not necessarily related to municipal court prosecution. I would recommend that we evaluate our office's participation in these boards as their terms come up." Stipulated Facts, ¶ 63, citing Ex. 64 at DEF002181.

On January 14, 2012, Rebenstorf sent a memo to Layton to inform him that the Law Department had expanded its diversion programs in traffic violations and petty theft cases to increase revenue and decrease jail fees.

On January 18, 2012, Rebenstorf submitted a draft layoff plan to Anne Warren, Interim Director of Human Resources, for review and discussion.  On January 19, 2012, he sent Layton the lay-off plan to eliminate the Chief Prosecutor position effective February 24, 2012.  In doing so, he stated that "[d]ue to the restructuring of the City Prosecutor[s'] office, and realignment of the duties and responsibilities of the Chief Deputy City Attorney, the position is no longer required for supervision of prosecution staff." Stipulated Facts, ¶ 66.  On January 28, 2012, Rebenstorf, Warren, Assistant City Manager Cathy Holdeman and Layton approved the lay-off plan.  Stipulated Facts, ¶ 67.

On February 17, 2012, Rebenstorf and Kathleen Harris from Human Resources met with McDonald to inform her of the lay-off.  He told McDonald that

> [d]ue to budgetary constraints, the directive from the City Manager for all departments to continue to look for ways to restructure operations, the restructuring of the Prosecutors' [O]ffice and re-alignment of duties and responsibilities of the Chief Deputy City Attorney position, the Chief Prosecutor[] position was being eliminated effective March 2, 2012.

Stipulated Facts, ¶ 68.  The City offered McDonald a position as an Attorney I at an annual salary of $78,389 with responsibilities including review of jail fees, prosecuting the environmental court docket, and other responsibilities as assigned.  Id.

On February 24, 2012, McDonald met privately with Dickgrafe.  McDonald stated that she believed the decision to eliminate her position was made suddenly and based on her comments in her current evaluation.  She claimed that women were treated differently than men – that Rebenstorf did not

22

yell at or treat men the way he treated women.[12]   McDonald accepted the Attorney I position with a reduction in salary of more than $23,000.

On February 28, 2012, McDonald filed an internal complaint of discrimination with Human Resources.  Stipulated Facts, ¶ 71, citing Ex. 66 at TWG000098.

On March 2, 2012, the Chief Prosecutor position terminated and McDonald began work an Assistant City Attorney I.  On March 7, McDonald applied for a position as Chief Probation Officer, but the City did not offer her that position.

On March 8, 2012, Interim Director of Human Resources Warren contacted Eric B. Metz of Triplett, Woolf & Garretson, LLC, regarding McDonald's discrimination complaint.  On March 20, 2012, Metz agreed to represent the City and spoke with McDonald.

The City discrimination and retaliation policies require a "factfinding investigation" and written findings and recommendations.  Doc. #66 at 72; Doc. #65 at 6.  On March 22, 2012, Metz wrote to McDonald.  He stated, "[a]s I have informed you, I have been retained by the City of Wichita as outside counsel to perform an investigation of the allegations of your discrimination complaint and as set forth in related documents which you indicate you have forwarded to the Kansas Human Rights Commission, and to report the results of that investigation to the City Manager." Doc. #66 at 334.

On March 23, 2012, McDonald filed a charge of discrimination with the EEOC and the KHRC. Stipulated Facts, ¶ 82. On March 27, 2012, the City received formal notice of the charges and suspended its internal investigation of her complaint.[13]

---

[12]     McDonald wanted to keep the supervisor's office, but Dickgrafe told her that Rebenstorf wanted Dickgrafe to take it.  Stipulated Facts, ¶ 69.

[13]     The City's Human Resources Policy contains a grievance procedure which applies to "a complaint brought by an employee . . .  who alleges a violation of City policies." Defendants'

(continued...)

On March 1, 2012, McDonald submitted an application for medical leave from March 26 to June 26, 2012.  With Rebenstorf's approval, the City granted McDonald medical leave from March 26 to June 18, 2012.  Stipulated Facts, ¶ 74, citing Ex. 67 at BF0501-505.  McDonald had surgery on March 26, 2012, and was on leave under the Family Medical Leave Act until July 18, 2012.  On July 18, 2012, when she returned from medical leave, McDonald resigned her position as Attorney I.

At his deposition, Rebenstorf admitted that McDonald was a "good prosecutor" and did "a good job" throughout her tenure at the City.  Ex. C, Rebenstorf Depo. at 17-18.  Rebenstorf testified that elimination of her position had "nothing" to do with job performance.  Id. at 18.

McDonald testified that Rebenstorf treated female attorneys in the Law Department much differently than he treated male attorneys.  She testified that Rebenstorf yelled at female attorneys, made derogatory remarks about them and made it a difficult place to work.  In particular, she testified that Rebenstorf yelled at Dickgrafe, Rundell and another female attorney, Beth Harlenske.  She never saw Rebenstorf yell at a male attorney or be disrespectful to a male attorney.  Rebenstorf made derogatory comments about female attorneys but she never heard him make derogatory remarks about male attorneys.  She did not give specific details about the yelling and derogatory remarks.

---

[13](...continued)
Ex. 1 at 48-49.  When an employee files a complaint with an outside agency, the procedure states as follows:

> If any grievance is filed under this section, and any complaint is filed, with any other board, agency or court with concurrent justification [sic] concerning the same incident, the grievance shall be held in abeyance until the other board, agency or court has rendered its decision.

Id. at 49.  Under this policy, the City has suspended investigation of five internal complaints between 2011 and 2014 when the employee filed a complaint with the KHRC and/or EEOC.  Ex. 84, Interrogatory No. 7, at 5-6.

McDonald also testified that Rebenstorf treated men differently than women when they made mistakes.  Ex. A., McDonald Depo. at 17-18.  For example, she testified that four men who worked in the legal department made mistakes and were not treated harshly in performance evaluations.  Id. at 20.  McDonald stated: "They actually did something to betray [Mr. Rebenstorf] or to not do what he wanted, and they didn't receive the same sort of treatment on evaluations or even day to day that, ultimately, I ended up with."  Id.  McDonald admitted that she had no information about the evaluations of these male employees.  McDonald testified that in eliminating her position, the City treated her differently than men.  She stated that male employees were not "laid off, demoted or fired" for having a dispute with Rebenstorf.  Id. at 20-21.  When asked for details, McDonald stated,

> And yes, and if I were a guy, you know, Jay sat on committees and [has] done things and nothing adverse has happened to him, and Jay reports directly to Gary. Brian's done things, sits on committees, done things and nothing adverse has happened to him; he reports to Gary.  You know, Mike North sat on committees, did extracurricular things, reported directly to Gary. I reported directly to Gary.  And he views me as being a traitor and  defying him and not telling him what's going on in regards to her complaint and what happens to me is I get demoted, I get my salary cut, and then I get removed from a committee.  So the difference is I report directly to Gary.  Those guys reported directly to Gary.

Id. at 211-12.

On January 14, 2014, McDonald filed suit in this Court.  Under Section 1983, she alleges that Rebenstorf denied her First Amendment right to free speech and free association and her Fourteenth Amendment right to equal protection.  Under Title VII and the KAAD, plaintiff alleges that the City discriminated against her on the basis of sex and retaliated against her.  Defendants assert that they are entitled to summary judgment on each claim.

**Analysis**

I.    Title VII And KAAD Claims Against The City For Gender Discrimination And Retaliation

Under Title VII and the KAAD, plaintiff asserts that by eliminating the Chief Prosecutor position, the City  discriminated against her on the basis of gender and retaliated against her for protected activity.[14]  The City argues that it eliminated the Chief Prosecutor position for legitimate reasons and not because of gender or in retaliation for protected activity.

A.    Title VII And KAAD Gender Discrimination Claims

Under Title VII and the KAAD, plaintiff bears the ultimate burden of proving that her employer intentionally discriminated against her.  Riser v. QEP Energy, 776 F.3d 1191, 1199 (10th Cir. 2015); Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008).  Plaintiff can prove intentional discrimination through either direct evidence or circumstantial evidence that creates an inference of intentional discrimination.  Riser, 776 F.3d at 1199.

Where, as here, plaintiff seeks to use circumstantial evidence to show discriminatory intent, the Court employs the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see Bennett v. Windstream Comm's, 792 F.3d 1261, 1266 (10th Cir. 2015).  Under McDonnell Douglas, plaintiff first must establish a prima facie case of gender discrimination.  A prima facie case generally requires plaintiff to show by a preponderance of the evidence that (1) she is a member of a protected class, (2) she suffered an adverse employment action and (3) the challenged action occurred under circumstances which give rise to an inference of discrimination.[15]  Bennett, 792 F.3d at

---

[14]    The standards are the same for Title VII and the KAAD.  See Lewis v. Std. Motor Prods., Inc., 203 F.Supp.2d 1228, 1233 n.13 (D. Kan. 2002).

[15]    The Tenth Circuit has also analyzed the prima facie case of discrimination using a
(continued...)

1266 (citing <u>E.E.O.C. v. PVNF, L.L.C.</u>, 487 F.3d 790, 800 (10th Cir. 2007)).  While the elements of a prima facie case "are neither rigid nor mechanistic, their purpose is the establishment of an initial inference of unlawful discrimination warranting a presumption of liability in plaintiff's favor." <u>Adamson</u>, 514 F.3d at 1146.

If plaintiff establishes a prima facie case, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for its actions.  <u>Bennett</u>, 792 F.3d at 1266 (citing <u>Adamson</u>, 514 F.3d at 1145.  If defendant does so, the burden of production shifts back to plaintiff to show that defendant's explanation was merely pretextual.  A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000).  Plaintiff may establish pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  <u>Jones v. Okla. City Pub. Sch.</u>, 617 F.3d 1273, 1280 (10th Cir. 2010) (further citations omitted).

---

[15](...continued)
similar four-part articulation of the test. <u>Swackhammer v. Sprint/United Mgmt. Co.</u>, 493 F.3d 1160, 1166 (10th Cir. 2007) (plaintiff must show she is member of protected class, was qualified for position, suffered adverse employment action and circumstances which support inference of unlawful discrimination).  Here, defendant appears to concede that plaintiff was qualified for the position, so the result under either test is the same.  The elements of a plaintiff's prima facie case may vary, depending on the context of the claim and the nature of the alleged conduct. <u>Bennett</u>, 792 F.3d at 1266 n.1) (Tenth Circuit has utilized similar versions of test, expressing preference for more concise formulations).

1.      Prima Facie Case

Defendant concedes the first two element of a prima facie case – that plaintiff belongs to a protected class and that elimination of her position as Chief Prosecutor was an adverse employment action.[16] Defendant argues that it is entitled to summary judgment because plaintiff cannot show that the adverse action occurred under circumstances which give rise to an inference of discrimination.

The Pretrial Order (Doc. #58), filed May 12, 2015, as amended by the Order On Unopposed Motion To Amend Pretrial Order And For Related Relief (Doc. #76), filed August 18, 2015, does not specify the factual basis for plaintiff's gender discrimination claim.  Further, in response to the City's assertion that she has not set out a prima facie case of gender discrimination, plaintiff focuses almost exclusively on her prima facie case of *retaliation*.  See Doc. #68 at 32-33.  In her supplemental brief, however, plaintiff points to facts which she asserts establish a prima facie case.

Plaintiff first relies on Rebenstorf's decision to fill the Attorney III position with a male attorney who had very little experience in Section 1983 litigation in federal court, combined with Rebenstorf's failure to encourage her to apply for that position when (unbeknownst to her) he was considering eliminating the Chief Prosecutor position.  Additionally, plaintiff points to her testimony that Rebenstorf treated female attorneys in the Law Department different from male attorneys.  Somewhat more specifically, plaintiff testified that Rebenstorf yelled at female attorneys, including Dickgrafe, Rundell and Harlenske, made derogatory remarks about them and "made it a difficult place to work."  Ex. A, McDonald Depo. at 11-12.  She never saw Rebenstorf yell at, disrespect or make derogatory remarks

---

[16]     For purposes of a discrimination claim, adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007).  Plaintiff describes other actions to bolster her assertion of discriminatory animus.

about a male attorney.[17]

Citing Adamson, defendant responds that plaintiff cannot sustain her claims with ambiguous, subjective comments.  To set out a prima facie case, plaintiffs in Adamson relied on one ambiguous comment regarding undue influence in addition to inconsistent application of an anti-nepotism policy. 514 F.3d at 1151-52.  The Tenth Circuit noted that even if plaintiff subjectively believed that one isolated and ambiguous statement was sexist, it did not support an inference of discriminatory intent.  Here, by contrast, plaintiff testified that Rebenstorf treated women differently than men by yelling and making derogatory remarks about them.  Although her testimony could have been more specific, it is evidence of discriminatory intent.

The Court finds that the circumstances in which Rebenstorf created and filled the Attorney III position, together with plaintiff's testimony that Rebenstorf yelled at and made derogatory comments about women attorneys but not male attorneys, give rise to a prima facie case.

The Court notes that plaintiff's Title VII claims against the City rely on the premise that in eliminating the Chief Prosecutor position, Rebenstorf was the decision maker.  In its summary judgment briefing on plaintiff's claims under Section 1983, the City asserts that under city policy, the City Manager has exclusive authority to make employment decisions and that plaintiff therefore cannot establish municipal liability under Section 1983 based on Rebenstorf's actions.  Plaintiff, however, has now abandoned any claims against the City under Section 1983.  See Pretrial Order (Doc. #58), as amended

---

[17]    Plaintiff claimed that four men who worked in the Legal Department made mistakes and were not treated as harshly in performance appraisals as she was treated.  She testified that each of these "men actually did something to betray [Rebenstorf] or to not do what he wanted, and they didn't receive the same sort of treatment on evaluations or even day to day that, ultimately, I ended up with."  Plaintiff admitted, however, that she had no information regarding the evaluations of these employees.

by <u>Order On Unopposed Motion To Amend Pretrial Order And For Related Relief</u> (Doc. #76).  In response to the amended pretrial order which adds plaintiff's claims under Title VII and the KAAD, the City does not raise the issue whether Rebenstorf was a decision maker.  If defendant made such an argument, the record would support a finding that Rebenstorf was the de facto decision maker or that plaintiff could succeed under a theory of "cat's paw" liability.  Under this theory, the biased motive of a subordinate can be imputed to the final decision maker.  <u>EEOC v. BCI Coca-Cola Bottling Co. of L.A.</u>, 450 F.3d 476, 487-88 (10th Cir. 2006).

2.     Defendant's Proffered Nondiscriminatory Reason

The City asserts legitimate, nondiscriminatory reasons for eliminating plaintiff's position: budgetary constraints and restructured operations of the Criminal Division.  The City cites evidence that it experienced severe budget issues in 2010 and 2011 and that the City Manager directed department leaders to review their operations for possible restructuring to cut costs and improve revenues.  Rebenstorf conducted a survey of the Prosecutors' Office and based upon the survey results, implemented management changes through Dickgrafe.  Over time, these changes resulted in the transfer of many duties from plaintiff to Dickgrafe and the transition of plaintiff's role from supervisor to front-line prosecutor.  In April of 2011, in response to budget issues, Dickgrafe gave Rebenstorf a proposal to eliminate the Chief Prosecutor position.  Budget Director Manning became involved and in January of 2012, the City Manager approved the plan.

The City has cited evidence of legitimate, nondiscriminatory reasons for restructuring the Prosecutors' Office, including the elimination of the Chief Prosecutor position. The burden thus shifts back to plaintiff to show a genuine issue of material fact whether the proffered reasons are a pretext for discrimination.

3.     Plaintiff's Evidence of Pretext

Plaintiff can present many forms of evidence to establish that defendant's stated reasons are pretextual.  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000) (plaintiff need not pursue particular means of demonstrating stated reasons pretextual).  Plaintiff typically makes a showing of pretext in one of three ways: with evidence that (1) defendant's stated reason for the adverse employment action was false; (2) defendant acted contrary to a written company policy; or (3) defendant acted contrary to an unwritten policy or practice.  Id.; see Crowe v. ADT Sec. Servs., Inc., 649 F.3d 1189, 1196 (10th Cir. 2011).

Plaintiff can show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and thus infer that the employer did not act for the asserted nondiscriminatory reasons.  Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1167 (10th Cir. 2007).

Plaintiff asserts that defendant's proffered reasons for eliminating the Chief Prosecutor position are a pretext for discrimination.  She asserts that the most important such evidence is the shifting and inconsistent positions taken by defendants.  She then sets forth a detailed chronology.  Because plaintiff's pretext argument is extremely nuanced and detailed, the Court sets out her factual argument as follows:

In February of 2010, the City Manager asked Rebenstorf to review the organization of the office to determine if staff assignments were properly aligned with the legal needs of the City.  In May of 2010, the City Manager directed all department heads to identify ways to more efficiently provide services and cut budgets.  In August of 2010, Rebenstorf asked all employees in the Prosecutors' Office to complete a comprehensive survey.  He stated that due to budget pressures, the City Manager had asked him to

review the way the office functioned, but added that to professionally and ethically perform legal services for the City, "it is necessary to maintain the attorney staffing level."  In October of 2010, Rebenstorf met with the prosecutors about a draft reorganization plan which included centralizing all charging decisions with the Chief Prosecutor.  On November 5, 2010, Rebenstorf met with the prosecutors about a second draft reorganization plan.  Both of these plans maintained attorney staffing levels and did not modify the supervisory structure.

On November 24, 2010, Jarman, whom plaintiff supervised, filed an EEOC charge alleging that Rebenstorf had retaliated against her.  Immediately after Jarman told plaintiff that she had filed the EEOC charge, Rebenstorf called plaintiff to his office and told her that he was upset that she had not kept him informed of events in the office.  Plaintiff told him that she had just learned of Jarman's complaint. Rebenstorf responded that he did not believe plaintiff and that he could longer trust her.

Three weeks later, on December 13, 2010, Rebenstorf first proposed changing the Chief Prosecutor position, suggesting that instead of a primarily supervisory position, it become more of a front-line prosecutor position.

On March 24, 2011, outside counsel for the City interviewed Rebenstorf, McDonald and others in the Law Department about Jarman's EEOC complaint.

In April of  2011, Rebenstorf changed his position regarding the need to maintain attorney staffing levels and for the first time advocated eliminating the Chief Prosecutor position.  At his deposition, when asked why he changed his mind, he responded, "the budget."  Specifically, he stated that "the budget requirements the manager was giving me was [sic] going to require me to deal with positions, cutting positions."  Rebenstorf could not point to any document from the City Manager which cut the Law Department budget or told him to cut positions.  In fact, the Law Department budget for 2012

increased.

Plaintiff asserts that based on all of these facts, a reasonable jury could conclude that Rebenstorf has provided no persuasive explanation for reversing his position from maintaining attorney staffing levels and current supervision structure (including the Chief Prosecutor position) to advocating the elimination of the Chief Prosecutor position. Plaintiff asserts that given the timing, a jury could conclude that Jarman's EEOC complaint and his perception that plaintiff must have been involved in it motivated Rebenstorf's reversal. Plaintiff asserts that a reasonable jury could conclude that Rebenstorf misrepresented his reasons for eliminating the Chief Prosecutor position.[18] In particular, she asserts that the City's "legitimate, nondiscriminatory reasons" are false, that Rebenstorf reversed his decision to retain the Chief Prosecutor position, and that the City's decision to hire a male attorney in 2011 shows that its reasons for eliminating her position were false. Plaintiff's Brief (Doc. #68) at 38-43.

The City argues that plaintiff has failed to demonstrate pretext because she cannot show that the City was not experiencing a budget crisis or that the idea of eliminating her position did not arise from efforts to restructure Law Department management to reduce costs in response to a budget crisis. The City also argues that plaintiff has produced no evidence that the surveys were a proximate cause in eliminating her position or that defendants cited the surveys as a reason to eliminate her position. Finally, the City asserts that plaintiff has failed to show that its decision to hire a male attorney, months before it decided to eliminate plaintiff's position, had any relationship to the decision to eliminate her position.

---

[18]     Plaintiff also asserts that contrary to internal policies, the City did not complete its internal investigation of her EEOC complaint. The City counters that under its policies the internal investigation is suspended once the EEOC takes over. Plaintiff has not offered evidence to rebut the City's argument on this point, and the Court finds that it does not constitute evidence of pretext.

Plaintiff primarily asserts that a jury could conclude that Rebenstorf is not a credible witness and therefore disbelieve his testimony regarding the proffered reason for eliminating her position. In response, defendant cites an insurance case for the proposition that "[s]tanding alone, attacks on the credibility of evidence offered by a summary judgment movant do not warrant denial of a summary judgment motion." Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 742 (10th Cir. 2004)(nonmoving party must present specific facts which demonstrate existence of material facts to be tried).

Plaintiff is correct that the credibility of the City's proffered reason is at issue, and that explanation depends largely on the credibility of Rebenstorf's testimony. Citing Jaramillo v. Colorado Judicial Department, 427 F.3d 1303, 1310 (10th Cir. 2005), the City points out that to raise an inference of pretext in the face of the employer's legitimate, nondiscriminatory explanation, plaintiff must undermine the employer's credibility to the point that a reasonable jury could not find in its favor. In Jaramillo, plaintiff argued that her employer failed to promote her based on gender. Id. at 1306. To show pretext, plaintiff produced evidence that the decision maker had provided different explanations why it did not promote her, one of which was factually incorrect. Id. at 1309. Although plaintiff's evidence called the decision maker's credibility into question, the Tenth Circuit held that it was insufficient to establish a genuine issue of material fact, concluding that the decision maker's initial false explanation was "simply . . . not outrageous enough to undermine [the employer's] legitimate explanation for its decision." Id. at 1310.

Here, plaintiff has pointed to inconsistencies in Rebenstorf's explanations from which a jury could find pretext. The City therefore is not entitled to summary judgment on plaintiff's gender discrimination claims under Title VII and the KAAD.

B.      Title VII And KAAD Retaliation Claims

Title VII and the KAAD forbid retaliation against an employee because she has "opposed" any practice made unlawful by Title VII, or because she has "participated" in an investigation, proceeding, or hearing  regarding a claim of discrimination.  Stover v. Martinez, 382 F.3d 1064, 1070 (10th Cir. 2004) (quoting 42 U.S.C. § 2000e-3(a)).  Plaintiff may prove a Title VII or KAAD violation with direct evidence of discrimination or retaliation, or by following the burden-shifting framework of McDonnell Douglas.  See Conroy v. Vilsack, 707 F.3d 1163, 1171 (2013).  Here, plaintiff does not rely on direct evidence of retaliation, so McDonnell Douglas applies.  Id.

1.      Prima Facie Case

To state a prima facie case of retaliation, plaintiff must show (1) that she engaged in protected opposition to discrimination or participated in an investigation regarding a claim of discrimination, (2) an employment action which a reasonable employee would have found materially adverse, and (3) a causal connection between the protected activity and the materially adverse action.  See Tabor v. Hilti, 703 F.3d 1206, 1219 (10th Cir. 2013)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006).

Regarding the first element of a prima facie case, plaintiff appears to assert that Rebenstorf retaliated against her for participating in an investigation of a Title VII complaint.  As evidence, she cites (1) his erroneous belief that plaintiff had supported or encouraged Jarman's complaint of retaliation and (2) the fact that on March 24, 2011, she participated in an interview regarding Jarman's complaint.  Neither side addresses whether a decision maker's subjective belief that plaintiff supported another's complaint of discrimination meets the requirement that plaintiff engaged in protected opposition to discrimination.  Plaintiff's participation in the interview on March 24, 2011, however, clearly meets the

35

first element of the prima facie case.  Abbott v. Crown Motor Co., 348 F.3d 537, 542-43 (6th Cir. 2003).

The City concedes the second element of plaintiff's prima facie case, i.e. that elimination of the Chief Prosecutor position was materially adverse employment action.

To establish the casual connection, plaintiff must produce evidence from which one can infer that the City would not have taken the adverse action if plaintiff had not engaged in protected activity. Plaintiff may show causal connection with evidence that justifies an inference of retaliatory motive, such as protected conduct closely followed by adverse action. O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001).  Where very close temporal proximity between the protected activity and the retaliatory conduct is lacking, however, plaintiff must offer additional evidence to establish causation. Conroy v. Vilsack, 707 F.3d 1163, 1181 (10th Cir. 2013) (no "precise temporal line" but if adverse action occurs in brief period up to one-and-a-half months after protected activity, temporal proximity alone sufficient to establish causation; if adverse action occurs three months after protected activity, timing alone not sufficient to establish causation).

The City decided to eliminate plaintiff's position in January of 2012 – nearly ten months after her protected conduct on March 24, 2011.  As early as June 11, 2011, however, Rebenstorf proposed eliminating the Chief Prosecutor position.  On its own, this time frame arguably establishes a causal link. See Conroy, 707 F.3d at 1181.  Further, to establish causation plaintiff also relies on the evidence of pretext set out on her gender claim.  For reasons discussed, plaintiff's evidence of pretext establishes a prima facie case on her retaliation claim.

2.      Defendant's Proffered Nondiscriminatory Reason

The burden thus shifts to defendant to show a legitimate, nonretaliatory reason for its actions. Defendant relies on the same justification it did in response to plaintiff's Title VII gender discrimination

claim, and the Court finds that it has satisfied that burden.

3. Plaintiff's Evidence Of Pretext

Plaintiff relies on the same pretext argument as in her Title VII and KAAD gender claims. For the reasons set forth in the Court's analysis of the gender claims, the Court finds that plaintiff has offered evidence on which a jury could reasonably find that defendant's articulated reasons were a pretext for retaliation. The Court therefore finds that defendant's motion for summary judgment on plaintiff's Title VII and KAAD retaliation claims should be overruled.

II.   First Amendment Retaliation Claims Against Rebenstorf

As noted, plaintiff asserts that Rebenstorf violated her First Amendment rights to free speech and free association in violation of Section 1983. See Pretrial Order (Doc. #58), as amended by Order On Unopposed Motion To Amend Pretrial Order And For Related Relief (Doc. #76). The pretrial order globally sets forth plaintiff's First Amendment claims and does not clearly identify the First Amendment conduct for which Rebenstorf allegedly retaliated. The only factual contentions which contain potentially protected First Amendment conduct are as follows:

> Upon learning about [Jarman's EEOC charge on November 29, 2010], Rebenstorf brought McDonald into his office and told her that his trust had been misplaced due to the EEOC charge, because she must have know this was coming and failed to warn him. He felt she was disloyal. Things became worse in March 2011, when McDonald gave a lengthy interview to the attorney [who was investigating Jarman's complaint.] * * *
>
> [B]efore McDonald's subordinate filed a retaliation charge with the EEOC, Rebenstorf had relied on the survey to expand the scope and authority of McDonald's position. It was only after the EEOC retaliation charge that the prosecutor surveys were cited as a basis to scale back McDonald's position.

Pretrial Order (Doc. #58) at 4.

In her response brief, plaintiff clarifies that she brings two distinct First Amendment claims. Specifically, plaintiff asserts that Rebenstorf retaliated against her for exercising her First Amendment

right (1) to freely associate with Jarman, who had filed an EEOC complaint, and to speak in the investigation of Jarman's complaint; and (2) to freely speak by filing her own EEOC complaint.[19]

Rebenstorf asserts that he is entitled to summary judgment because plaintiff cannot establish that he violated her First Amendment rights. Rebenstorf asserts that even if plaintiff can show a constitutional violation, he is entitled to qualified immunity because the asserted right was not clearly established when the City eliminated plaintiff's position.

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity provides government officials immunity from suit as well as liability for discretionary acts. See Mitchell v. Forsyth, 472 U.S. 511, 526-27 (1985). The doctrine of qualified immunity serves the goals of protecting officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority. Butz v. Economou, 438 U.S. 478, 506 (1978).

When a defendant asserts a qualified immunity defense at the summary judgment stage, the burden shifts to plaintiff to show that defendant violated a constitutional right and that the constitutional right was clearly established at the time of the alleged violation. Quinn v. Young, 780 F.3d 998, 1004 (10th Cir. 2015) (citing Ashcroft v. Al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2080 (2011), see Vondrak v. City of Las Cruces, 535 F.3d 1198, 1204 (10th Cir. 2008). To satisfy this burden, plaintiff must show facts which when viewed in the light most favorable to plaintiff, demonstrate that (1) defendant's conduct

---

[19]      Although the pretrial order also refers to plaintiff's right to petition, she does not articulate any such separate claim in her briefs.

violated a constitutional right and (2) the right was clearly established at the time of the alleged violation. Quinn, 780 F.3d at 1004; see Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  If plaintiff does so, the burden shifts back to defendant to prove that no genuine issues of material fact exist and that defendant is entitled to judgment as a matter of law.  See Olsen, 312 F.3d at 1312.  If the record shows an unresolved issue of fact relevant to the qualified immunity analysis, the Court must deny the motion for summary judgment.  See id.

When a defendant asserts qualified immunity, the Court may address either question first.  See Quinn, 780 F.3d at 1004.  Here, the Court first addresses whether plaintiff has set forth facts to demonstrate that Rebenstorf violated her First Amendment rights.

A.      Retaliation Related To Jarman's Complaint

Preliminarily, to state a claim for First Amendment retaliation, plaintiff must identify the constitutionally-protected speech or activity that allegedly caused defendant to retaliate.  See Trant v. Oklahoma, 754 F.3d 1158, 1165 (10th Cir. 2014).  Plaintiff asserts that Rebenstorf eliminated the Chief Prosecutor position in retaliation for her association with Jarman's complaint and the fact that she testified in cooperation with the EEOC investigation.  Doc. #68 at 55.  Plaintiff asserts that the First Amendment protects these activities.

1.      Association Claim For Perceived Support Of Jarman's Internal Complaint

Plaintiff first asserts that on January 28, 2012, Rebenstorf approved the plan to eliminate her position because he mistakenly believed that she supported Jarman in making her internal complaint of retaliation on November 10, 2010.[20]  In support of this claim, plaintiff points to cases in which plaintiffs

---

[20]      Plaintiff asserts that Rebenstorf cannot avoid liability for retaliation just because his perception that she supported Jarman was erroneous.  See Emblen v. Port Auth. of New York/New

(continued...)

alleged that defendants retaliated against them for speech by family members.  See Fannon v. Patterson, No. 3:13-CV-14, 2014 WL 4273337, at *4 (S.D. Ohio Aug. 29, 2014) (plaintiff's First Amendment retaliation claim based on parent's complaint where speech by person "in  close relationship" invoked government's retaliatory response) (quoting Lewis v. Eufaula City Bd. of Educ., 922 F.Supp.2d 1291, 1302-03) (M. D. Ala. 2012); see also Adler v. Pataki, 185 F.3d 35, 45 (2d Cir. 1999) (retaliatory discharge based solely on lawsuit by spouse actionable under First Amendment association clause); Talley v. Brentwood Union Free Sch. Dist., No. 08-790, 2009 WL 1797627, at *6 (E.D.N.Y. June 24, 2009) (citing Adler to uphold claim of retaliation against daughter for father's speech); Cain v. Tigard-Tualatin Sch. Dist. 23J, 262 F. Supp.2d 1120, 1127 (D. Or.  2003) (upholding claim where retaliatory conduct motivated by speech of parents); Agostino v. Simpson, No. 08-CV-5760, 2008 WL 4906140, at *5 (S.D.N.Y. Nov. 17, 2008) (defendants took adverse action in retaliation for First Amendment activities of plaintiff's father); Serena H. v. Kovarie, 209 F. Supp.2d 453, 458 (E.D. Pa. 2002) (upholding First Amendment retaliation claim based on speech of plaintiff's mother).

Rebenstorf distinguishes these cases because they all involve association with a person in a close relationship with plaintiff.  Indeed, plaintiff has not pointed to any cases in which a supervisory or co-worker relationship, without more, supported an association claim.  Although a close, non-familial relationship could support a First Amendment association claim, plaintiff has not shown any facts to establish such a relationship in this case.  The Court therefore finds that Rebenstorf is entitled to summary judgment on plaintiff's First Amendment retaliation claim that Rebenstorf retaliated because

---

[20](...continued)
Jersey, No. 00 CIV. 8877(AGS), 2002 WL 498634, at *11 (S.D.N.Y. Mar. 29, 2002) (fact that plaintiff was not homosexual irrelevant to plaintiff's claim of harassment based on sexual orientation).  The Court agrees.

of her alleged association with Jarman and her internal grievance.

> 2.      Speech Claim Based On Plaintiff's Interview Regarding Jarmans's EEOC Complaint

As noted, plaintiff also asserts that Rebenstorf eliminated her Chief Prosecutor position in retaliation for her cooperation with the EEOC investigation of Jarman's complaint.

When considering a speech retaliation claim, the Court applies the Garcetti/Pickering test to determine whether the employee has established a prima facie case. Eisenhour v. Weber Cnt'y, 744 F.3d 1220, 1227-28 (10th Cir. 2014) (citing Dixon v. Kirkpatrick, 553 F.3d 1294, 1301-02 (10th Cir. 2009)); see Garcetti v. Ceballos, 547 U.S. 410, 418 (2006); Pickering v. Bd. of Educ., 391 U.S. 563 (1968). The five-part test requires the Court to examine the following issues:

1.      Did the employee speak pursuant to his or her official duties? If so, the speech is unprotected and the inquiry ends.

2.      If the employee did not speak pursuant to his or her official duties, did the speech in question involve a matter of public concern? If not, the speech is unprotected and the inquiry ends.

3.      If the speech involved a matter of public concern, does the employee's interest in the expression outweigh the government employer's interest in regulating the speech of its employees so that it can carry on an efficient and effective workplace? If not, the speech is unprotected and the inquiry ends.

4.      If the employee's interest outweighs that of the employer, was the employee's speech a substantial factor driving the challenged employment action? If not, the inquiry ends.

5.      If the employee shows that speech was a motivating factor, can the employer show that it would have taken the same employment action against the employee absent the protected speech? If so, plaintiff is not entitled to constitutional protection.

Allen v. Kline, 507 F. Supp.2d 1150, 1168 (D. Kan. 2007) (citing Brammer-Hoelter v. Twin Peaks

Charter Acad., 492 F.3d 1192, 1201-03 (10th Cir. 2007)).[21]  The first three questions are questions of law for the Court; the final two issues are ordinarily for the trier of fact.  See id.

When public employees make statements pursuant to their official duties, they do not speak as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.  Id.  The Tenth Circuit takes a broad view of speech that is "pursuant" to an employee's official duties.  Thomas v. City of Blanchard, 548 F.3d 1317, 1324 (10th Cir. 2008).  Speech may be pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform.  Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1203 (10th Cir. 2007) (speech within scope of official duty even if concerns an unusual aspect of job not part of everyday functions).  If speech "reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties."  Id.

Rebenstorf asserts that plaintiff's participation in the EEOC interview, and any speech she made during that interview, fell within plaintiff's official duties and therefore was not protected.  He points to City policies which prohibit discrimination and harassment, require every employee to report discrimination and harassment and require all supervisory employees to investigate and take immediate and appropriate corrective action.  Although the Tenth Circuit takes a broad view whether speech is pursuant to official duties, it has also noted that a generalized grievance policy cannot be an official duty

---

[21]     Implicit within this five-prong analysis is a requirement that the public employer have taken adverse employment action against the employee.  Hook v. Regents of Univ. of Cal., 394 Fed. App'x 522, 534 (10th Cir. 2010) (citing Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d 1223, 1235-36 (10th Cir. 2009)).  An employment action is adverse if it would deter a reasonable person from exercising his First Amendment rights.  Hook, 394 Fed. App'x. at 535 (quoting Couch, 587 F.3d at 1238) (standard for adverse employment action in First Amendment retaliation context identical to test for retaliation claims under Title VII).

without eviscerating <u>Garcetti</u> and the general constitutional principle that "public employees do not surrender all their First Amendment rights by reason of their employment." <u>Brammer-Hoelter</u>, 492 F.3d at 1204 (citing <u>Garcetti</u>, 126 S.Ct. at 1957, 1961).

Plaintiff cites <u>Freitag v. Ayers,</u> 468 F.3d 528 (9th Cir. 2006), for the proposition that an employee does not have an official duty to make a complaint to an outside agency. Here, however, the issue is not plaintiff's EEOC complaint, but her participation in the investigation of Jarman's complaint. Rebenstorf correctly points out that City policy required employees to cooperate in the investigation. Plaintiff has not pointed to any cases which hold that a supervisor's participation in the investigation of a complaint by another employee falls outside official duties. The Court therefore finds that Rebenstorf is entitled to summary judgment on plaintiff's First Amendment retaliation claim based on her participation in the interview regarding Jarman's discrimination complaint.

B.      Retaliation Related To Plaintiff's Own EEOC Complaint

Plaintiff asserts that Rebenstorf eliminated her Chief Prosecutor position because she filed her own EEOC complaint. Because plaintiff was a public employee, to determine whether she has set out a prima facie case of retaliation, the Court applies the five-part <u>Garcetti/Pickering</u> test. For purposes of analysis, the Court assumes without deciding that plaintiff can meet the first three elements of the test and proceeds to the fourth step.

The fourth element of <u>Garcetti/Pickering</u> requires plaintiff to prove that her protected speech was a substantial or motivating factor in defendant's adverse employment decision. Although causation is normally a question of fact for the jury, a plaintiff opposing summary judgment must show direct or indirect evidence from which a reasonable jury could find the required causal link between the protected activity and the allegedly retaliatory actions. <u>See</u> <u>Reinhardt v. Albuquerque Bd. of Educ.</u>, 595 F.3d 1126,

43

1134 (10th Cir. 2010).

In support of her claim that Rebenstorf retaliated against her for speech contained in her own EEOC complaint,  plaintiff asserts only one adverse employment action – the elimination of her position as Chief Prosecutor.  Because plaintiff made her EEOC complaint *after defendant eliminated her Chief Prosecutor position,* she clearly cannot show a causal link between her speech and the adverse action.

Accordingly, Rebenstorf is entitled to summary judgment on plaintiff's First Amendment claim based on her own EEOC complaint.

III.     Gender Discrimination Claim Against Rebenstorf Under Section 1983

Under Section 1983, McDonald alleges that when Rebenstorf eliminated the Chief Prosecutor position because of her gender, he violated her Fourteenth Amendment right to equal protection.  Rebenstorf does not raise a qualified immunity defense to this claim.  Rather, he simply denies that he violated plaintiff's equal protection rights.  As set forth above, the Court has found that plaintiff has set forth a prima facie case of gender discrimination.  Whether the claim is brought under Section 1983 or Title VII, the elements of a disparate treatment claim are the same.  Maldonado v. City of Altus, 433 F.3d 1294, 1307 (10th Cir. 2006) (in disparate treatment discrimination suits, elements of plaintiff's case same whether case brought under Section 1981, Section 1983 or Title VII), overruled on other grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); see also Weeks v. McLaughlin, No. 09-2498-CM/GLR, 2011 WL 2631831, at *4 (D. Kan. June 28, 2011).  Plaintiff's gender claim against Rebenstorf under Section 1983 relies upon the same facts as her Title VII gender discrimination claim against the City.  For the reasons that the City is not entitled to summary judgment on plaintiff's Title VII claim, Rebenstorf is not entitled to summary judgment on plaintiff's gender discrimination claim under Section 1983.

**IT IS THEREFORE ORDERED** that <u>Defendants' Motion For Summary Judgment</u> (Doc. # 59) filed May 22, 2015 be and hereby is **SUSTAINED IN PART**.  Defendants are entitled to summary judgment on plaintiff's claims under Section 1983 that Gary Rebenstorf deprived plaintiff of First Amendment rights to free speech and free association.

The following claims remain for trial: Plaintiff's claim under Section 1983 that Rebenstorf violated her equal protection rights based on gender discrimination and her claims under Title VII and the KAAD that the City discriminated against her because of gender and retaliated against her for participation in Jarman's EEOC complaint.

Dated this 5th day of January, 2016 in Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
Kathryn H. Vratil
United States District Judge
